UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

ERLIN A. ALMONTE VARGAS,

                          Plaintiff,

        v.

CITY OF PEEKSKILL,
DAVID RAMBO, *and* CORNELL
HAMMONDS,

                          Defendants.

No. 20-CV-10143 (KMK)

OPINION & ORDER

---

Joseph A. Turco, III, Esq.
Brooklyn, NY
*Counsel for Plaintiff*

Joseph E. Field, Esq.
Littler Mendelson, P.C.
New York, NY
*Counsel for Defendants*

KENNETH M. KARAS, United States District Judge:

Plaintiff Erlin Almonte Vargas ("Plaintiff") brings this Action against the City of

Peekskill (the "City"), David Rambo ("Rambo"), and Cornell Hammonds ("Hammonds";

collectively, "Defendants"), alleging discrimination based on national origin under Title VII of

the Civil Rights Act of 1964 ("Title VII"), 42 U.S.C. §§ 2000e *et seq.*, and the New York Human

Rights Law ("NYSHRL"), N.Y. Exec. Law § 296.  (*See* Compl. (Dkt. No. 1).)  Before the Court

is Defendants' Motion for Summary Judgment.  (*See* Defs' Not. of Mot. (Dkt. No. 40).)  For the

foregoing reasons, Defendants' Motion for Summary Judgment is granted.

I.  Background

A.  Factual Background

The following facts are taken from the Parties' statements pursuant to Local Civil Rule 56.1, specifically Defendants' 56.1 Statement, (Defs.' Rule 56.1 Statement ("Defs' 56.1") (Dkt. No. 41)), Plaintiff's Response to Defendants' 56.1 Statement, (Pl's Resp. to Defs' 56.1 Statement ("Pl's Resp. 56.1") (Dkt. No. 48-1)), and the admissible evidence submitted by the Parties.  The facts are recounted "in the light most favorable to" Plaintiff, the non-movant. *Wandering Dago, Inc. v. Destito*, 879 F.3d 20, 30 (2d Cir. 2018) (quotation marks and citation omitted).

Plaintiff is a Hispanic male, born in the Dominican Republic, and is fluent in Spanish. (Defs' 56.1 ¶ 1; Pl's Resp. 56.1 ¶ 1.)  On November 14, 2016, Plaintiff was hired as a Laborer in the Water and Sewer Department ("WSD") of the City, which provides municipal services to its residents.  (Defs' 56.1 ¶¶ 3–4, 32, 41; Pl's Resp. 56.1 ¶¶ 3–4, 32, 41.)  Specifically, the WSD's water distribution system ("Distribution") is responsible for the upkeep and maintenance of the City's water supply to residents and businesses, such as fixing water main breaks, flushing sewers, and other tasks.  (Defs' 56.1 ¶ 5; Pl's Resp. 56.1 ¶ 5.)  "The WSD also operates a large water treatment and filtration plant (the 'Filter Plant') which controls the release of water that flows through the distribution system."  (Defs' 56.1 ¶ 5; Pl's Resp. 56.1 ¶ 5.)  At all times relevant to the instant Action, Plaintiff worked in Distribution, but would occasionally be assigned to the Filter Plant.  (Defs' 56.1 ¶ 6; Pl's Resp. 56.1 ¶ 6.)

1.  Plaintiff's Employment at WSD

Plaintiff was hired as a Laborer in 2016 by Rambo, who has been the City's Water Superintendent since June 14, 2016.  (Defs' 56.1 ¶¶ 7, 41; Pl's Resp. 56.1 ¶¶ 7, 41.)  At the time, Rambo recommended that Plaintiff be hired "over six to eight other candidates applying for the

2

position," and was aware that Plaintiff was Hispanic.  (Defs' 56.1 ¶¶ 42–43; Pl's Resp. 56.1 ¶¶ 42–43.)  "The position of Laborer is the lowest level position within the WSD," and Plaintiff's duties and responsibilities as a laborer included various forms of manual labor, including "digging ditches and trenches, cutting grass and brush, fixing water main breaks, flushing hydrants, painting, cleaning bathrooms and common areas, removing garbage and rubbish, and doing whatever other tasks were assigned by supervisors."  (Defs' 56.1 ¶¶ 35–36; Pl's Resp. 56.1 ¶¶ 35–36.)  Laborers work under direction of supervisors, and do not have any direct supervisory responsibility themselves.  (Defs' 56.1 ¶ 34; Pl's Resp. 56.1 ¶ 34.)  "The ability to follow oral instructions and get along with other employees were [] important part[s] of [Plaintiff's] job as a Laborer."  (Defs' 56.1 ¶ 37; Pl's Resp. 56.1 ¶ 37.)

Plaintiff worked for the City for less than three years, becoming a member of the local union (the "Union") after a one year probationary period.  (Defs' 56.1 ¶¶ 44–45; Pl's Resp. 56.1 ¶¶ 44–45.)  "Shortly before [Plaintiff] completed his probation, Rambo began to receive negative feedback from [Plaintiff's first supervisor and Foreman of Distribution Vincent Nardone ("Nardone") and Assistant Water Superintendent Vincent Powell ("Powell")] about problems with [Plaintiff's] job performance."  (Defs' 56.1 ¶ 50; Pl's Resp. 56.1 ¶ 50; *see also* Defs' 56.1 ¶¶ 8, 12 (introducing Nardone and Powell); Pl's Resp. 56.1 ¶¶ 8, 12 (same).)  Plaintiff states that he "reported to Rambo verbally prior to May 2017 about issues [he] was having" with Nardone "being verbally abusive and very hostile toward[]" Plaintiff.  (Mem. of Law in Opp. to Mot. ("Pl's Opp.") Ex. B ("Pl's Aff.") ¶ 10 (Dkt. No. 48-2).)  At Plaintiff's six-month evaluation, Nardone and Powell advised Plaintiff that he took too long to complete certain work-related tasks.  (*See* Defs' 56.1 ¶¶ 46, 49; Pl's Resp. 56.1 ¶¶ 46, 49.)  "On July 28, 2017, Rambo received a memo from Powell recounting various issues with Vargas, including a lack of respect for his

supervisors, difficulty in getting along with his co-workers, questioning his work assignments, and problems with arriving to work on time." (Defs' 56.1 ¶ 51; Pl's Resp. 56.1 ¶ 51; *see also* Decl. of David Rambo in Supp. of Mot. ("Rambo Decl.") Ex. C at 2 (Dkt. No. 43-3).)

Nardone retired in December 2017 and was replaced by Hammonds as the foreman of Distribution and Plaintiff's direct supervisor. (Defs' 56.1 ¶¶ 12, 52; Pl's Resp. 56.1 ¶¶ 12, 52.) When Hammonds began working in the WSD, he started as a Laborer and was promoted to Motor Equipment Operator prior to his promotion to foreman. (Defs' 56.1 ¶ 10; Pl's Resp. 56.1 ¶ 10.) Hammonds is also African-American. (Defs' 56.1 ¶ 11; Pl's Resp. 56.1 ¶ 11.) In 2018, Powell also retired and was replaced by Brian Raphael ("Raphael") as the Assistant Water Superintendent from April 2018 until August 2021. (Defs' 56.1 ¶ 8; Pl's Resp. 56.1 ¶ 8.)

Throughout the relevant period, Raphael prepared numerous disciplinary write-ups regarding Plaintiff's behavior and testified that Plaintiff was "often disrespectful, insubordinate[,] and would scream, yell, and curse." (Defs' 56.1 ¶¶ 53, 67; Pl's Resp. 56.1 ¶¶ 53, 67.) In addition, Plaintiff received verbal warnings for his behavior, such as being "counseled about not using his cell phone for personal reasons during work hours, for leaving the work site without first contacting his supervisors, and for using a City vehicle to get his lunch." (Defs' 56.1 ¶¶ 54–55; Pl's Resp. 56.1 ¶¶ 54–55.) At some point during Plaintiff's employment, Plaintiff discussed how Hammonds treated Plaintiff at work with Rambo, stating that Hammonds "did not like him and gave him undesirable job assignments." (Defs' 56.1 ¶ 62; Pl's Resp. 56.1 ¶ 62.) Joanna Duncan ("Duncan"), the City's Human Resources Manager investigated Plaintiff's claims, concluding that there was no evidence to substantiate Plaintiff's claims, and that Plaintiff was properly disciplined for insubordination for yelling at Rambo and Raphael. (Defs' 56.1 ¶¶ 20, 63; Pl's Resp. 56.1 ¶¶ 20, 63.)

2.  Plaintiff's Disciplinary History and Appeals

The Parties agree on the facts of a series of notable incidents in Plaintiff's disciplinary history at WSD.  For example, on December 7, 2017, during a morning meeting where Hammonds distributed work assignments to members of the Distribution crew, Plaintiff asked Hammonds if he would be paid for "out of title" work that he performed.  (Defs' 56.1 ¶ 71; Pl's Resp. 56.1 ¶ 71.)  The interaction escalated between Plaintiff and Hammonds, with both raising their voices and Plaintiff "standing over Hammonds, yelling and pointing and him" and "shouting that he was going to what he wanted to do."  (Defs' 56.1 ¶¶ 72–73.)[1]  As a result, Plaintiff was issued a ten-day suspension, and was advised that the City planned to pursue his termination for insubordination.  (Defs' 56.1 ¶ 74; Pl's Resp. 56.1 ¶ 74.)  Plaintiff challenged the suspension through his Union and, pursuant to an agreement between the City, the Union, and Plaintiff, he had a counseling memo placed in his file for six months in lieu of the suspension. (Defs' 56.1 ¶ 75; Pl's Resp. 56.1 ¶ 75.)  Plaintiff received the counseling memo on May 24, 2018, which stated that "[w]hen engaging in discussions with any supervisor about work assignments . . ., it is expected that [Plaintiff will] do so in a forum that is separate from other employees at a time that is mutually agreed upon" between Plaintiff and the supervisor.  (Decl. of Joseph E. Field in Supp. of Mot. ("Field Decl.") Ex. Q ("2017 Mem.") at 2 (Dkt. No. 44-17); *see also* Defs' 56.1 ¶ 76; Pl's Resp. 56.1 ¶ 76.)

---

[1] Plaintiff lodges the same dispute to statements 72 and 73, rationalizing that Plaintiff "rais[ing] his voice" was in response to being "yelled at for asking a question to Hammonds." (*See* Pl's Resp. 56.1 ¶¶ 72–73.)  However, because Plaintiff does not appear to dispute the fact that he did raise his voice or any other aspect of the argument, the Court reads this dispute as semantic in nature. Thus, the Court deems this fact admitted.  *See Arch Specialty Ins. Co. v. TDL Restoration, Inc.*, No. 18-CV-6712, 2021 WL 1225447, at *1 n.1 (S.D.N.Y. Mar. 31, 2021) (collecting cases) ("Where the Parties identify disputed facts but with semantic objections only or by asserting irrelevant facts, [the Court will not consider] these purported disputes, which do not actually challenge the factual substance described in the relevant paragraphs, . . . as creating disputes of fact.").

On December 31, 2017, Plaintiff and other members of Distribution reported to an emergency water main break in the City.  (Defs' 56.1 ¶¶ 77–78; Pl's Resp. 56.1 ¶¶ 77–78.) Hammonds asked the crew to return the following morning at 7:00 AM to continue to work on the water main break, however Plaintiff clocked in late and arrived at the site even later after driving from the Filter Plant.  (Defs' 56.1 ¶¶ 79–82; Pl's Resp. 56.1 ¶¶ 79–82.)  Plaintiff was issued a written reprimand on January 5, 2018 for the incident, stating that "failure to comply immediately with the 7:00 am reporting requirement will result in future disciplinary action up to and including termination of employment."  (Field Decl. Ex. R ("2018 Rep.") at 2 (Dkt. No. 44-18); *see also* Defs' 56.1 ¶ 81; Pl's Resp. 56.1 ¶ 81.)

On May 14, 2018, Plaintiff wrote a letter requesting a transfer to another Laborer position in the Department of Public Works.  (Defs' 56.1 ¶ 64; Pl's Resp. 56.1 ¶ 64; *see also* Field Decl. Ex. S ("2018 Compl. Ltrs.") at 2 (Dkt. No. 44-19).)  In this letter, Plaintiff stated that he felt that he was "being treated differently compared to others and purposely isolated because of [his] race," that his supervisors did not want him around, and that it was "currently a hostile environment for numerous reasons."  (2018 Compl. Ltrs. 2.)  Plaintiff spoke with several individuals about the transfer, including Rambo, Hammonds, Duncan, and a former City Manager, but the City decided not to transfer Plaintiff.  (Defs' 56.1 ¶ 64; Pl's Resp. 56.1 ¶ 64.) On May 18, 2018, Plaintiff "submitted a letter to the City's Human Resources Department alleging that since December 2017, [Plaintiff] had been harassed by Hammonds."  (Defs' 56.1 ¶ 83; Pl's Resp. 56.1 ¶ 83; *see also* 2018 Compl. Ltrs. 3–4.)  In the letter, Plaintiff specified that he believed Hammonds harassed him "because [Plaintiff is] Spanish" and that Hammonds was "abusing his power and creating a hostile work environment."  (2018 Compl. Ltrs. 4.)  However, the Parties disagree on the outcome of this letter.  Defendants state that, on or around September

6

27, 2018, Duncan told Vargas that the investigation into his claims raised in the letter would be closed because Plaintiff "failed to meet with her in response to the City's requests for an interview." (Defs' 56.1 ¶ 84; *see also* Duncan Decl. Ex. C at 2 (Dkt. No. 57-3).) Plaintiff claims that Duncan "never responded to [his] initial complaint in December of 2017" and denies failing to cooperate with the Human Resources department's investigation (the "HR department"). (Pl's Resp. 56.1 ¶ 84.)

Over the course of three days in August 2018, Plaintiff received five separate notices of discipline. (Defs' 56.1 ¶ 85; Pl's Resp. 56.1 ¶ 85; *see also* Field Decl. Ex. T ("2018 Nots.") (Dkt. No. 44-20).) On August 7, 2018, Plaintiff "left his assigned work area to go get fuel without authorization from management." (2018 Nots. 2.) On the same day, Plaintiff and another employee arrived late to a water tower to receive instructions for work, and after receiving those instructions, Plaintiff "became insubordinate, responding to [the supervisor] that he was not going to do the work and was only going to perform a certain part of the assigned job." (*Id*. at 6.) On August 8, 2018, Plaintiff "did not get permission to leave his job site" and went to City Hall to speak with management about requesting a face mask. (Defs' 56.1 ¶ 86; Pl's Resp. 56.1 ¶ 86; *see also* 2018 Nots. 4.) On August 9, 2018, Plaintiff "became infuriated and started to scream and yell" at superiors after they asked him about his whereabouts after a lunch break. (2018 Nots. 8.) In another writeup of the incident, Raphael stated that this incident from Plaintiff "was the wors[t] [he had] ever seen to this date." (*Id*. at 11.) On August 10, Raphael memorialized the incident in an email to superiors, reporting that Plaintiff was "involved in an outburst where he was yelling, screaming[,] and cursing at Raphael and Rambo and flailing his arms around." (Defs' 56.1 ¶ 87; Pl's Resp. 56.1 ¶ 87; *see also* Field Decl. Ex. FF at 2 (Dkt. No. 44-32).)

On August 8, 2018, Plaintiff submitted another letter to HR, "complaining about the events of August 7, 2018" and "alleging that Hammonds was harassing, intimidating[,] and retaliating against him[,] and request[ed] a transfer out of WSD."  (Defs' 56.1 ¶ 90; Pl's Resp. 56.1 ¶ 90; *see also* Field Decl. Ex. U (Dkt. No. 44-21).)  In the letter, Plaintiff cites various work-related tasks assigned to him by Hammonds, and argues that Hammonds "is purposely causing a work slowdown . . .[,] harassing, intimidating, and retaliating against [Plaintiff] for no reason other than [Plaintiff's] race[.]"  (Field Decl. Ex. U at 3.)  Plaintiff was interviewed by a member of the City's HR department regarding these allegations.  (Defs' 56.1 ¶ 91; Pl's Resp. 56.1 ¶ 91.)

In addition, Plaintiff formally challenged two of the notices of discipline through the Union grievance process on the same day that the notices were issued on August 9, 2018.  (Defs' 56.1 ¶ 97; Pl's Resp. 56.1 ¶ 97; *see also* Field Decl. Ex. X ("Cole Op.") 1 (Dkt. No. 44-24).)  On January 25, 2019, Arbitrator Sheila Cole ("Arbitrator Cole") denied the grievance, finding that the City had just cause to issue the notices of disciplines, and that Plaintiff's insubordination warranted a five-day suspension without pay.  (Defs' 56.1 ¶ 98; Pl's Resp. 56.1 ¶ 98; Cole Op. 13–16.)  During the proceedings, Plaintiff—through his Union—introduced evidence in support of his two complaints and other instances of alleged harassment by Hammonds, specifically "attribut[ing] their poor treatment of him to his being Hispanic."  (Cole Op. 7–8.)  Plaintiff also stated that HR never investigated his complaint he lodged about Hammonds in 2018.  (*Id.*)  In addition to finding Plaintiff's testimony generally "unworthy of credit" and noting that the record included "several other illustrations of [Plaintiff's] untruthfulness," Arbitrator Cole found Plaintiff's testimony that he did not recall whether HR reached out to him to investigate his

harassment allegations "absurd, given how upset he says he is about his alleged mistreatment by Hammonds and others." (*Id*. at 13–14; *see also* Defs' 56.1 ¶ 99; Pl's Resp. 56.1 ¶ 99.)

On or about August 14, 2018, Plaintiff submitted a written complaint to the New York State Division of Human Rights ("NYSDHR"), alleging discrimination and retaliation by Hammonds and Rambo based on Plaintiff's Dominican national origin and Hispanic ethnicity. (Defs' 56.1 ¶ 92; Pl's Resp. 56.1 ¶ 92; *see also* Field Decl. Ex. V ("NYSDHR Compl.") (Dkt. No. 44-22); Field Decl. Ex. W ("NYSDHR Op.") (Dkt. No. 44-23).) Plaintiff also submitted a second letter to NYSDHR on August 20, 2018, as well as a third letter responding to the City's submitted Position Statement on October 1, 2018. (Defs' 56.1 ¶ 93; Pl's Resp. 56.1 ¶ 93.) On January 31, 2019, NYDSHR found that there was "no probable cause to believe that [the City, Hammonds, and Rambo] have engaged in or are engaging in the unlawful discriminatory practice complained of [by Plaintiff]." (NYSDHR Op. 1; *see also* Defs' 56.1 ¶ 94; Pl's Resp. 56.1 ¶ 94.) As relevant to the instant Action, NYDSHR found the following:

> The evidence adduced from the investigation does not support Complainant's claim that Respondents treated him in a discriminatory manner because of his national origin (Dominican), race/color (Hispanic) or had retaliated against him for filing internal complaints of discrimination. Specifically, the record includes insufficient evidence of a nexus between Respondents' conduct and Complainant's national origin, race/color. Nor is there evidence to support a retaliation charge.
>
> [. . .] The evidence adduced from the investigation does not support Complainant's claim of national origin (Dominican), race/color (Hispanic) discrimination. While Complainant claims that he was subjected to disparate treatment compared to his non-Hispanic coworkers, the record includes insufficient evidence to support his claim that the disparate treatment was the product of unlawful discriminatory animus toward Hispanic Dominicans. Complainant's claim that his supervisor opined that Hispanics remove jobs from Americans is not sufficient to support Complainant's claim here. The record shows and Complainant has not denied that the individuals who received the training opportunities were given preference because those individuals require training certification to maintain their title; Complainant's title did not require him to maintain such certification or to receive such training opportunity.

Further, the record does not support that Respondents' decision to deny him the positions he sought was unlawful discrimination related to his race and national origin.  For instance, the record shows and Complainant acknowledged that nepotism was the reason the successful candidate for the position he applied for in December 2017/January 2018 received the position over Complainant.  As for the remaining positions where the vacancy was filled, the Division reviewed the applications of the successful candidates and observed that the successful candidates exhibited greater seniority and more qualification when compared to Complainant's employment history and experience.

[ . . .] Finally, Complainant's claim of retaliation is also unsubstantiated. [. . .] Here, a review of the record shows that Complainant sent emails to report race discrimination to Respondent City of Peekskill, including emails dated May 14. 2018, May 18, 2018[,] and August 8, 2018.  The record also shows that Respondent City of Peekskill immediately responded either on the same day or the day after, on May 15. 2018, May 18, 2018[,] and August 9, 2018, for further details and an opportunity to interview Complainant.  The record however is devoid of evidence that Complainant followed through with Respondent City of Peekskill's requests for additional information, including an interview and responses to Respondent City of Peekskill's questions.   Complainant has not challenged Respondents' assertions that he failed to cooperate.

(NYSDHR Op. at 1–3; *see also* Defs' 56.1 ¶¶ 94–95; Pl's Resp. 56.1 ¶¶ 94–95.)  Plaintiff did not appeal the NYSDHR's opinion.  (Defs' 56.1 ¶ 96; Pl's Resp. 56.1 ¶ 96.)

On January 24, 2019, Plaintiff refused to sign in to work using a new biometric time clock that the City had purchased for WSD employees, replacing the older "time clock and punch in method."  (Defs' 56.1 ¶¶ 105, 107; Pl's Resp. 56.1 ¶¶ 105, 107.)  Plaintiff stated that the time clock was an invasion of his privacy.  (Defs' 56.1 ¶ 109; Pl's Resp. 56.1 ¶ 109.) Raphael called the Director of City Services who came to the Filter Plant to speak with Vargas, and Plaintiff eventually clocked in using the new time clock around 12:30pm, approximately three hours after Raphael instructed him to do so.  (Defs' 56.1 ¶ 108; Pl's Resp. 56.1 ¶ 108.)  The next day, Raphael prepared a notice of discipline regarding the incident, and after a three-month delay, the notice was served on Plaintiff with a penalty of a loss of five vacation days.  (Supp. Decl. of Joseph E. Field in Supp. of Mot. ("Field Supp. Decl.") Ex. A ("Moskowitz Op.) at 3

(Dkt. No. 58-1).)  On December 4, 2019, Arbitrator Ivor Moskowitz ("Arbitrator Moskowitz") found that Plaintiff "should have obeyed the directive from his immediate supervisor" and was insubordinate during this incident.  (Moskowitz Op. at 4; *see also* Defs' 56.1 ¶ 110; Pl's Resp. 56.1 ¶ 110.)  While he did find that the City "had just cause to bring its [notice of discipline] against" Plaintiff, Arbitrator Moskowitz found that the City "did not have just cause to impose a five (5) day loss of vacation pay" and instead reduced Plaintiff's penalty two days.  (Moskowitz Op. 5; *see also* Defs' 56.1 ¶ 111; Pl's Resp. 56.1 ¶ 111.)

Finally, on March 14, 2019, Plaintiff "refused to stay and work overtime [with his entire Distribution crew] in connection with an emergency water main break."  (Defs' 56.1 ¶ 100; Pl's Resp. 56.1 ¶ 100.)  Pursuant to his Union's collective bargaining agreement, because the water main break was classified as an emergency, Plaintiff was not allowed to leave the work site after his regular work shift had ended."  (Defs' 56.1 ¶ 101; Pl's Resp. 56.1 ¶ 101.)  "Pursuant to a Notice of Discipline [], [Plaintiff] was suspended for ten days," a decision which Plaintiff challenged through the grievance and arbitration process.  (Field Supp. Decl. Ex. B ("Riegel Op.) 2 (Dkt. No. 58-2); *see also* Defs' 56.1 ¶ 103; Pl's Resp. 56.1 ¶ 103.)[2]  On January 17, 2020, Arbitrator Arthur Riegel ("Arbitrator Riegel") denied Plaintiff's grievance, finding that the City had just cause to suspend Plaintiff for ten days.  (Riegel Op. 5–7; Defs' 56.1 ¶ 104; Pl's Resp. 56.1 ¶ 104.)  In addition, Arbitrator Moskovitz found Plaintiff's testimony that he told Raphael that he had a childcare emergency "not credible," as Raphael had previously accommodated

---

[2] In their 56.1 statements, the Parties appear to mistakenly agree that the City implemented a 5-day suspension.  (*See* Defs' 56.1 ¶ 103; Pl's Resp. 56.1 ¶ 103.)  However, given the accurate statement of the record in the arbitrator's opinion, (*see* Riegel Op. 2), and the Parties' reference to a ten-day suspension in a subsequent Rule 56.1 statement, (*see* Defs' 56.1 ¶ 104; Pl's Resp. 56.1 ¶ 104), the Court assumes that the suspension lasted for ten days for the purpose of the instant Motion.

Plaintiff in a similar situation.  (Riegel Op. 6; Defs' 56.1 ¶ 104; Pl's Resp. 56.1 ¶ 104.)

Moreover, Arbitrator Moskovitz found Plaintiff's testimony that he had an emergency at all "not

credible," stating that Plaintiff "evidently did not want to work overtime on March 14, 2019[,]

and tried to get out of it by claiming that he had an emergency."  (Riegel Op. 6.)

### 3.  Termination of Plaintiff's Employment

Finally, the Parties recount the circumstances surrounding Plaintiff's termination from

WSD.  At some time during Plaintiff's employment, the City purchased a hard plastic face mask

for Plaintiff's use on the job, which cost approximately $100.  (Defs' 56.1 ¶ 112; Pl's Resp. 56.1

¶ 112.)  In addition, Plaintiff was supplied with disposable face masks for use, and Plaintiff had

his own supply of face masks that he used for work.  (Defs' 56.1 ¶¶ 114, 117; Pl's Resp. 56.1 ¶¶

114, 117.)  During the relevant period, Plaintiff's hard plastic face mask was stolen out of his

locker, and Raphael explained to Plaintiff that he needed to bring in a doctor's note if he wanted

the City to replace the mask.  (Defs' 56.1 ¶ 113; Pl's Resp. 56.1 ¶ 113.)

On May 16, 2019, Plaintiff went to Dr. Alexis Harmon ("Dr. Harmon") to get a doctor's

note discussing Plaintiff's allergies so that he could get a new "full face mask."  (Def's 56.1 ¶

120; Pl's Resp. 56.1 ¶ 120.)  Plaintiff provided the City with this doctor's note on May 22, 2019,

which stated that it was "necessary that [Plaintiff] 'use a full face mask while doing

environmental work, which may include cutting grass, working on water pipes etc.'"  (Field

Decl. Ex. Z at 2 (Dkt. No. 44-26); *see also* Defs' 56.1 ¶ 121; Pl's Resp. 56.1 ¶ 121.)  Shortly

thereafter, the City purchased a new full face mask for Plaintiff, which cost approximately $175.

(Defs' 56.1 ¶ 122; Pl's Resp. 56.1 ¶ 122.)  The City requires employees to get their masks "fit-

tested" pursuant to OSHA regulations, and as such, Raphael made an appointment for Plaintiff.

(Defs' 56.1 ¶¶ 124, 126; Pl's Resp. 56.1 ¶¶ 124, 126.)  On June 3, 2019, Plaintiff appeared for

his fit-test but refused to shave his "Van Dyke" or "goatee" style facial hair as required for

testing.  (Defs' 56.1 ¶¶ 125, 129; Pl's Resp. 56.1 ¶¶ 125, 129.)  Raphael sent an email to Duncan

on the same day, requesting further direction on the type of work Plaintiff could perform without

a face mask.  (Defs' 56.1 ¶ 127; Pl's Resp. 56.1 ¶ 127.)

On June 4, 2019, Duncan gave Plaintiff a memo stating that he "need[s] to comply with

the requirements to be fit tested, as this is required to use the full face mask [Plaintiff's]

physician has prescribed."  (Field Decl. Ex. Z at 2; *see also* Defs' 56.1 ¶ 128; Pl's Resp. 56.1 ¶

128.)  The memo also advised that if Plaintiff "wish[ed] to have [his] physician prescribe an

alternative full face mask that would be in compliance with OSHA regulations on respiratory

protection to address working with severe allergies, please provide the City with the information

no later than June 14, 2019 so that the City may consider it as an option."  (Field Decl. Ex. Z at

2; *see also* Defs' 56.1 ¶ 130; Pl's Resp. 56.1 ¶ 130.)  Plaintiff did not provide a new doctor's

note by the deadline.  (Defs' 56.1 ¶ 138; Pl's Resp. 56.1 ¶ 138.)  At 10:00 am on June 17, 2019,

Plaintiff's employment was terminated effective immediately "for insubordination for failing to

timely provide the City with the requested medical information needed to address his request for

a mask."  (Defs' 56.1 ¶¶ 139, 145; Pl's Resp. 56.1 ¶¶ 139, 145.)[3]  Plaintiff returned later that

afternoon with a doctor's note—also dated June 17, 2019—that stated that Plaintiff "may wear

the provided mask" and did not offer an alternative to the mask already purchased by the City.

(Defs' 56.1 ¶¶ 141, 143; Pl's Resp. 56.1 ¶¶ 141, 143.)

Plaintiff challenged his termination through his Union's grievance and arbitration

procedures.  (Defs' 56.1 ¶¶ 146–47; Pl's Resp. 56.1 ¶¶ 146–47.)  On November 18, 2019,

Arbitrator Howard Edelman ("Arbitrator Edelman") ruled in favor of the City, denied Plaintiff's

---

[3] While the Parties' Rule 56.1 statements appear to agree Plaintiff met with Duncan "on the morning of Monday, June 19, 2019," (*see* Defs' 56.1 ¶ 139; Pl's Resp. 56.1 ¶ 139), the Court takes judicial notice that the correct date is Monday, June 17, 2019.

grievance, and upheld Plaintiff's termination.  (Defs' 56.1 ¶ 148; Pl's Resp. 56.1 ¶ 148; *see also*

Field Decl. Ex. BB ("Edelman Op.") 13 (Dkt. No. 44-28).)  In denying Plaintiff's grievance,

Arbitrator Edelman found several aspects of Plaintiff's testimony to be not credible.  (Defs' 56.1

¶ 149; Pl's Resp. 56.1 ¶ 149.)  For example, Arbitrator Edelman found Plaintiff's "claim that

shaving his beard is against his religion is inadequate[,] and [Plaintiff] offered no proof that

[Plaintiff's religion] required him to keep his beard[,]" and as a result, Arbitrator Edelman was

"convinced that [Plaintiff] did not want to shave and looked for ways to avoid doing so and still

keep his job."  (Edelman Op. 9.)  In addition, the Arbitrator found that there was "no basis in the

record that the different requirements [for face mask fit tests between Plaintiff and another

employee] were part of an attempt to unfairly oust" Plaintiff.  (*Id*.)  Finally, Arbitrator Edelman

underscored that the letter submitted by Plaintiff after his termination was "more than

inadequate" and "simply made no sense[,]" as it "directly contradicted the prior one issued only a

month earlier."  (*Id*. at 11.)  Arbitrator Edelman concluded that "viewed together[,] the notes

demonstrate an intent to 'game the system' rather than contributing meaningful medical

documentation" and that Plaintiff "sought to manipulate the circumstances so as to suit his own

desires."  (*Id*. at 11–12; *see also* Defs' 56.1 ¶ 150; Pl's Resp. 56.1 ¶ 150.)  Following the

decision, counsel for the Union "concluded that there was no basis to pursue an application to

vacate or modify the award and recommended that [Plaintiff] obtain his own attorney if he

wanted to challenge the award."  (Defs' 56.1 ¶ 152; Pl's Resp. 56.1 ¶ 152.)

### 4.  Plaintiff's Allegations of Discriminatory Comments

Finally, Plaintiff alleges that, at various unspecified times during his three-year tenure at

WSD, Hammonds made discriminatory comments about Plaintiff regarding his national origin.

Specifically, Plaintiff alleges that "Hammonds made [] comments about [Plaintiff] speaking in

Spanish around five times[,] . . . made [] comments about stupid Dominicans perhaps twice[,] . . .

[and] made [] comments about Dominicans taking American jobs about three or four times."
(Defs' 56.1 ¶ 155; Pl's Resp. 56.1 ¶ 155.)  Some examples of these comments include that
Hammonds allegedly "made comments . . . about the smell of [Plaintiff's] food, stating that
Spanish people like to cut grass and do landscaping work, ask[ed] why Dominicans hang their
clothes outside to dry, complain[ed] that Dominicans come here and take jobs[,] and stat[ed] that
Dominicans should adapt to the American culture."  (Defs' 56.1 ¶ 153; Pl's Resp. 56.1 ¶ 153.)
Another employee confirmed that he heard Hammonds making some of these comments
intermittently, specifically "on one occasion in the breakroom."  (Defs' 56.1 ¶¶ 157–58, 177–78;
Pl's Resp. 56.1 ¶¶ 157–58, 177–78.)

### 5.  Equal Employment Opportunity Commission Filing

According to the Complaint, Plaintiff filed a charge of discrimination against Defendants
with the Equal Employment Opportunity Commission ("EEOC") on March 24, 2020.  (Compl.
6.)  After investigation, the EEOC was "unable to conclude that the information [provided]
establishes violations of the statute" and issued a right to sue letter to Plaintiff on September 2,
2020.  (Compl. Ex. A at 1 (Dkt. No. 1-2).)

### B.  Procedural History

Plaintiff filed his initial Complaint on December 2, 2020.  (*See* Compl. (Dkt. No. 1).)
Defendants filed an answer to the Complaint on February 24, 2021.  (Dkt. No. 13.)  After
completing discovery, Defendants filed a pre-motion letter in anticipation of filing a motion for
summary judgment on December 20, 2021.  (Dkt. No. 36.)  After receiving Plaintiff's response,
(Dkt. No. 38), the Court held a pre-motion conference on January 12, 2022 and adopted a
briefing schedule, (*see* Dkt. (minute entry for January 12, 2022); Order (Dkt. No. 39)).

On March 11, 2022, Defendants filed the instant Motion.  (*See* Not. of Mot.; Defs' 56.1;
Mem. of Law in Supp. of Mot. ("Defs' Mem.") (Dkt. No. 42); Rambo Decl.; Field Decl.)  After

15

an extension of time, (*see* Dkt. No. 46), and some misfiling, (*see* Dkt. Nos. 47–51), Plaintiff filed

his Opposition on April 18, 2022.  (*See* Pl's Opp.; Pl's Resp. 56.1.)  On May 9, 2022, Defendants

filed their Reply.  (*See* Reply Mem. in Supp. of Mot. ("Def's Reply") (Dkt. No. 54); Decl. of

Jose Hammonds in Supp. of Mot. (Dkt. No. 55); Decl. of Joseph E. Field in Supp. of Mot. (Dkt.

No. 56); Decl. of Joanna Duncan in Supp. of Mot. (Dkt. No. 57).)  At the request of the Court on

February 3, 2023, Defendants filed a supplement declaration.  (Field Supp. Decl.)

## II.  Discussion

### A.  Standard of Review

Summary judgment is appropriate where the movant shows that "there is no genuine

dispute as to any material fact and the movant is entitled to judgment as a matter of law."  FED.

R. CIV. P. 56(a); *see also Psihoyos v. John Wiley & Sons, Inc.*, 748 F.3d 120, 123–24 (2d Cir.

2014) (same).  "In deciding whether to award summary judgment, the [C]ourt must construe the

record evidence in the light most favorable to the non-moving party and draw all reasonable

inferences in its favor."  *Torcivia*, 17 F.4th at 355; *see also Horror Inc. v. Miller*, 15 F.4th 232,

240 (2d Cir. 2021) (same).  "It is the movant's burden to show that no genuine factual dispute

exists."  *Vt. Teddy Bear Co. v. 1-800 Beargram Co.*, 373 F.3d 241, 244 (2d Cir. 2004); *see also*

*Red Pocket, Inc. v. Interactive Commc'ns Int'l, Inc.*, No. 17-CV-5670, 2020 WL 838279, at *4

(S.D.N.Y. Feb. 20, 2020) (same).

"However, when the burden of proof at trial would fall on the non[-]moving party, it

ordinarily is sufficient for the movant to point to a lack of evidence to go to the trier of fact on an

essential element of the non[-]movant's claim," in which case "the non[-]moving party must

come forward with admissible evidence sufficient to raise a genuine issue of fact for trial in order

to avoid summary judgment."  *CILP Assocs., L.P. v. Pricewaterhouse Coopers LLP*, 735 F.3d

114, 123 (2d Cir. 2013) (alteration and quotation marks omitted).  Further, "[t]o survive a

[summary judgment] motion . . . , [a non-movant] need[s] to create more than a 'metaphysical' possibility that his allegations were correct; he need[s] to 'come forward with specific facts showing that there is a genuine issue for trial,'" *Wrobel v. County of Erie*, 692 F.3d 22, 30 (2d Cir. 2012) (emphasis omitted) (quoting *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586–87 (1986)), "and cannot rely on the mere allegations or denials contained in the pleadings," *Guardian Life Ins. Co. v. Gilmore*, 45 F. Supp. 3d 310, 322 (S.D.N.Y. 2014) (quotation marks omitted); *see also Wright v. Goord*, 554 F.3d 255, 266 (2d Cir. 2009) ("When a motion for summary judgment is properly supported by documents or other evidentiary materials, the party opposing summary judgment may not merely rest on the allegations or denials of his pleading.").  And, "[w]hen opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment." *Scott v. Harris*, 550 U.S. 372, 380 (2007).

"On a motion for summary judgment, a fact is material if it might affect the outcome of the suit under the governing law."  *Royal Crown Day Care LLC v. Dep't of Health & Mental Hygiene*, 746 F.3d 538, 544 (2d Cir. 2014) (quotation marks omitted).  At this stage, "[t]he role of the court is not to resolve disputed issues of fact but to assess whether there are any factual issues to be tried." *Brod v. Omya*, 653 F.3d 156, 164 (2d Cir. 2011) (quotation marks omitted).  Thus, a court's goal should be "to isolate and dispose of factually unsupported claims."  *Geneva Pharms. Tech. Corp. v. Barr Labs. Inc.*, 386 F.3d 485, 495 (2d Cir. 2004) (quotation marks omitted) (quoting *Celotex Corp. v. Catrett*, 477 U.S. 317, 323–24 (1986)).

When ruling on a motion for summary judgment, a district court should consider only evidence that would be admissible at trial.  *See Nora Beverages, Inc. v. Perrier Grp. of Am., Inc.*,

164 F.3d 736, 746 (2d Cir. 1998).  "[W]here a party relies on affidavits . . . to establish facts, the statements 'must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant . . . is competent to testify on the matters stated.'"  *DiStiso v. Cook*, 691 F.3d 226, 230 (2d Cir. 2012) (quoting Fed. R. Civ. P. 56(c)(4)); *see also Sellers v. M.C. Floor Crafters, Inc.*, 842 F.2d 639, 643 (2d Cir. 1988) ("Rule 56 requires a motion for summary judgment to be supported with affidavits based on personal knowledge . . . ."); *Baity*, 51 F. Supp. 3d at 419 (disregarding "statements not based on [the] [p]laintiff's personal knowledge"); *Flaherty v. Filardi*, No. 03-CV-2167, 2007 WL 163112, at *5 (S.D.N.Y. Jan. 24, 2007) ("The test for admissibility is whether a reasonable trier of fact could believe the witness had personal knowledge." (quotation marks omitted)).

    B.  Analysis

    Plaintiff brings several overlapping claims alleging that Defendants violated Title VII and NYSHRL by discriminating against Plaintiff because of his Dominican national origin.  (*See* Compl. 3–5.)  Specifically, Plaintiff alleges that Defendants took the following adverse employment actions against him:  (1) terminated his employment; (2) failed to promote him; (3) retaliation; (4) harassment; (5) hostile work environment; and (6) denied Plaintiff personal protective equipment ("PPE") "that by law they were required to provide which in turn led to further harassment when [Plaintiff] would attempt to request it or obtain it."  (*See id*.)

    Defendants seek summary judgment on all of Plaintiff's claims, arguing primarily that: (1) Plaintiff's termination-based claims should be dismissed because the City had a legitimate, nondiscriminatory reason for terminating Plaintiff, which was affirmed by a neutral arbitrator, (*see* Defs' Mem. 9–14), (2) Plaintiff cannot establish national origin-based discrimination because Plaintiff has failed to provide any comparators to prove that "Defendants treated [Plaintiff] less favorably than similarly situated employees outside his protected group," (*see id*.

18

at 14–18), (3) Plaintiff's hostile work environment claims should be dismissed because "even assuming that Plaintiff's allegations were true . . ., the comments do not rise to the level of a viable claim," (*see id*. at 18–22), (4) Plaintiff's retaliation claims should be dismissed because his "job performance issues began before [Plaintiff] engaged in any protected activity," (*see id*. at 22–24), and (5) Plaintiff's claims against the individual defendants should be dismissed because they are barred under Title VII and were previously brought before the NYSDHR, precluding the same claims from being brought in court under the NYSHRL, (*see id*. 24–25).

### 1.  Preliminary Issues

The Court will address these arguments to the extent necessary to decide the instant Motion.  However, the Court notes three threshold issues at the outset of its analysis.  First, "[i]t is well settled that there is no individual liability under Title VII."  *Davis-Bell v. Columbia Univ.*, 851 F. Supp. 2d 650, 687 (S.D.N.Y. 2012) (citing *Lore v. City of Syracuse*, 670 F.3d 127, 169 (2d Cir. 2012)); *see also Patterson v. Cnty. of Oneida*, 375 F.3d 206, 221 (2d Cir. 2004) (noting that "individuals are not subject to liability under Title VII," including "individual defendants with supervisory control over a plaintiff" (citations and quotation marks omitted)).  Accordingly, to the extent that Plaintiff intends to bring his Title VII claims against the individual Defendants, these claims are dismissed.  *See Tenemille v. Town of Ramapo*, No. 18-CV-724, 2020 WL 5731964, at *10 (S.D.N.Y. Sept. 24, 2020) (dismissing retaliation claims against individual defendants with prejudice).

Second, Defendants argue that Plaintiff is precluded from bringing NYSHRL claims against the individual Defendants in federal court, as Plaintiff elected to bring similar discrimination and retaliation claims before the NYSDHR.  (Defs' Mem. 24–25.)  The NYSHRL provides that a person claiming unlawful discrimination may bring a suit in court "unless such person has filed a complaint hereunder or with any local commission on human rights."  N.Y.

Exec. Law § 297(9).  This provision precludes a plaintiff from pursuing his discrimination claims in a court of law when the same claims were previously brought before a local administrative agency.  *See Guardino v. Vill. of Scarsdale Police Dep't*, 815 F. Supp. 2d 643, 646 (S.D.N.Y. 2011) (noting that when the NYSDHR "has issued a finding of no probable cause . . .  plaintiff's claims . . . are barred by the law['s] election of remedies provisions," and that this "bar is jurisdictional" (alterations in original, quotation marks omitted)); *James v. Coughlin*, 508 N.Y.S.2d 231, 232 (App. Div. 1986) ("The filing of a complaint with the Division precludes the commencement of an action in court based on the same incident, or based on the same discriminatory grievance, and which seeks the same relief as that sought in the complaint." (citations omitted)); *see also DuBois v. Macy's Retail Holdings, Inc.*, 533 F. App'x 40, 41 (2d Cir. 2013) (summary order) (finding that a plaintiff is precluded "from pursing his discrimination claims in a court of law where the same claims were previously brought before a local administrative agency").

"Where there is a 'sufficient identity of issue' between the [NYSDHR] complaint and the court action, the subsequent litigation is barred."  *Hegde v. Montefiore Med. Ctr.*, No. 21-CV-9596, 2022 WL 18108559, at *2 (S.D.N.Y. Dec. 3, 2022) (alteration in original) (quoting *Borum v. Vill. of Hempstead*, 590 F. Supp. 2d 376, 383 (E.D.N.Y. 2008)).  "Put simply, 'a litigant cannot split claims and assert some in court and others before an agency if they all arise out of the same course of conduct.'"  *Id*. (citations omitted).  However, Plaintiff's claims are not identical: by alleging that his termination was integral to each of his claims under the NYSHRL, which postdates Plaintiff's NYSDHR complaint, the Court finds that Plaintiff is not precluded from litigating these claims here.

Third and finally, Plaintiff has abandoned a number of his claims and potential arguments through his Opposition to Defendants' Motion.  While Plaintiff has conceivably brought his Title VII and NYSHRL claims for national origin-based discrimination grounded in all five adverse employment actions outlined in Plaintiff's Complaint, Plaintiff has not responded to the following of Defendants' arguments in his Opposition to Defendants' Motion: (1) failure to promote; (2) denial of PPE; and (3) any adverse employment actions based in alleged disparate treatment.  (*See generally* Pl's Opp.; *see also* Defs' Reply 6.)  Courts routinely hold that where a counseled plaintiff "fail[s] to address [the] defendants' arguments against or even mention several of [his or her] claims," those claims are deemed "abandoned."  *Robinson v. Am. Int'l Grp., Inc.*, No. 08-CV-1724, 2009 WL 3154312, at *4 & n.65 (S.D.N.Y. Sept. 30, 2009) (collecting cases); *see also Kovaco v. Rockbestos–Surprenant Cable Corp.*, 834 F.3d 128, 143–44 (2d Cir. 2016) (holding that the counseled plaintiff abandoned hostile work environment based claims because the plaintiff's brief in opposition was "bereft of any *mention* of the purported . . . claims, let alone argument why these claims should survive summary judgment" (emphasis in original)); *Scott v. JPMorgan Chase & Co.*, No. 13-CV-646, 2014 WL 338753, at *2 (S.D.N.Y. Jan. 30, 2014) ("[T]he [p]laintiff's opposing [m]emorandum of [l]aw does not respond to this argument, and effectively concedes these arguments by his failure to respond to them." (citation omitted)).[4]

---

[4] In connection with Plaintiff's Opposition to summary judgment on his hostile work environment claim, Plaintiff does mention "the disparate treatment" and "the mask games Peekskill played," which the Court very charitably identifies as a reference to Plaintiff's denial of PPE claim.  (*See* Pl's Opp. 5–6.)  However, Plaintiff is quite clear here, describing these as "material disputed facts" rather than substantive legal arguments countering Defendants' claims. (*Id*. at 6.)  As such, because the Plaintiff himself characterized these arguments as fact and further provided no response to Defendants' arguments in support dismissal of certain claims, the Court considers these legal claims as abandoned.

Therefore, the Court dismisses Plaintiff's Title VII claims against the individual

Defendants, and finds that Plaintiff has abandoned the following claims: (1) failure to promote;

(2) denial of PPE; and (3) any claims based in disparate treatment.  The Court will examine only

Plaintiff's remaining claims in ruling on Defendants' Motion.

### 2.  Discrimination Claim

Title VII prohibits discrimination against an employee based on that employee's "race,

color, religion, sex, or national origin."  42 U.S.C. § 2000e-2(a).  The NYSHRL echoes this

prohibition and adds to it, prohibiting discrimination against an employee based on that

employee's "age, race, creed, color, national origin, citizenship or immigration status, sexual

orientation, gender identity or expression, military status, sex, disability, predisposing genetic

characteristics, familial status, marital status, or status as a victim of domestic violence[.]"  N.Y.

Exec. Law § 296(1).

Claims of discrimination under Title VII and the NYSHRL are analyzed pursuant to the

familiar three-part framework set forth in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792

(1973).  *See Walsh v. N.Y.C. Hous. Auth.*, 828 F.3d 70, 74–75 (2d Cir. 2016) ("Claims

of . . . discrimination under Title VII and the NY[S]HRL are analyzed under the familiar burden-

shifting framework established in *McDonnell Douglas* . . . . "); *Zheng-Smith v. Nassau Health

Care Corp.*, 486 F. Supp. 3d 611, 620–21 (E.D.N.Y. 2020) ("Claims for race and national origin

discrimination under Title VII [and the] NYSHRL . . . are . . . analyzed using the burden-shifting

framework established by the Supreme Court in *McDonnell Douglas*."), *aff'd*, 2021 WL

4097316 (2d Cir. 2021) (summary order), *cert. denied*, 142 S. Ct. 1675 (2022).  "Under this

framework, at the summary judgment stage, a plaintiff must first demonstrate a prima facie case

of employment discrimination by showing that: '(1) []he was within the protected class; (2) []he

was qualified for the position; (3) []he was subject to an adverse employment action; and (4) the

adverse action occurred under circumstances giving rise to an inference of discrimination.'"

*Farmer v. Shake Shack Enters.*, 473 F. Supp. 3d 309, 324 (S.D.N.Y. 2020) (quoting *Menaker v.*

*Hofstra Univ.*, 935 F.3d 20, 30 (2d Cir. 2019)); *see also Holcomb v. Iona Coll.*, 521 F.3d 130,

138 (2d Cir. 2008) (establishing the same criteria).  "The burden of establishing a prima facie

case is not onerous, and has been frequently described as minimal."  *Walsh*, 828 F.3d at 75

(quoting *Norton v. Sam's Club*, 145 F.3d 114, 118 (2d Cir. 1998)).  "The burden of production

then shifts to the defendant to offer a legitimate, non-discriminatory reason for the allegedly

discriminatory conduct[,]" and "[u]pon such a showing, the plaintiff must demonstrate that the

reasons offered by the defendant are a mere pretext for discrimination."  *Farmer*, 473

F. Supp. 3d at 324 (citing *Littlejohn v. City of N.Y.*, 795 F.3d 297, 307–08 (2d Cir. 2015)); *see*

*also Abrams v. Dep't of Pub. Safety*, 764 F.3d 244, 251 (2d Cir. 2014) ("[T]he final and ultimate

burden is on the plaintiff to establish that the defendant's reason is in fact pretext for unlawful

discrimination.").

     Defendants do not contest for purposes of their Motion that Plaintiff (1) is a member of a

protected class as a person born in the Dominican Republic and (2) was qualified for the position

he held at WSD.  (*See* Defs' Mem. 15 n.4.)  However, in response to Plaintiff's discrimination

claim based in his termination, Defendants argue that Plaintiff cannot establish a prima facie case

of discrimination and that, in any event, Defendants had a legitimate and nondiscriminatory

reason for terminating Plaintiff, confirmed by a neutral arbitrator, which Plaintiff "cannot show

[is] pretextual."  (*See* Defs' Mem. 9–14.)[5]  The Court agrees.

---

[5] The Court will separately address Plaintiff's remaining harassment, retaliation, and hostile work environment claims.  *See infra* sections II.B.2–II.B.4.

Defendants primarily rely upon *Collins v. N.Y.C. Transit Auth.*, 305 F.3d 113 (2d Cir. 2002) to argue that "the decision of an arbitrator is highly probative and should be given substantial weight" in determining whether a termination contains discriminatory intent.  (*See* Defs' Mem. 10–12.)  In *Collins*, the plaintiff had filed a grievance against the Transit Authority after he was terminated for assaulting his supervisor.  *Collins*, 305 F.3d at 117.  The plaintiff was represented by his union at an arbitration hearing.  *Id*.  The arbitration board issued an opinion, finding that the plaintiff assaulted his supervisor and upholding his termination.  *Id*.  In reviewing the district court's grant of summary judgment in favor of defendants, the Second Circuit underscored that while "a plaintiff's burden of establishing a prima facie case in the context of employment discrimination is minimal," the plaintiff could not meet this "low threshold because the circumstances of [the plaintiff's] termination do not give rise to or support an inference of discrimination or retaliation."  *Id*. at 118 (citation and quotation marks omitted). Specifically, the Court stated that the plaintiff's termination "occurred . . . only after a decision, based on substantial evidence, of an undisputedly independent, neutral, and unbiased adjudicator that had the power to prevent the termination.  This fact is highly probative of the absence of discriminatory intent in that termination."  *Id*. at 119 (citing *Alexander v. Gardner-Denver Co.*, 415 U.S. 36, 60 n.21 (1974) (discussing factors relevant to determining how much weight to accord an arbitral decision)); *see also id.* at 115 ("Where an employee's ultimate termination depends upon, and is allowed by, a decision of an independent and unbiased arbitrator based on substantial evidence after a fair hearing, the arbitration decision has probative weight regarding the requisite causal link between an employee's termination and the employer's illegal motive."). The Second Circuit concluded by noting:

> In sum, a negative arbitration rendered under a CBA does not preclude a Title VII
> action by a discharged employee.  However, a decision by an independent tribunal

that is not itself subject to a claim of bias will attenuate a plaintiff's proof of the requisite causal link.  Where, as here, that decision follows an evidentiary hearing and is based on substantial evidence, the Title VII plaintiff, to survive a motion for summary judgment, must present strong evidence that the decision was wrong as a matter of fact—e.g. new evidence not before the tribunal—or that the impartiality of the proceeding was somehow compromised.

*Id*. (citation omitted).

Here, Plaintiff challenged his termination through his Union's grievance procedures, and Plaintiff attended the arbitration hearing where he was represented by the Union and its counsel. (Defs' 56.1 ¶¶ 146–47; Pl's Resp. 56.1 ¶¶ 146–47.)  Both sides presented evidence before Arbitrator Edelman at a hearing on September 30, 2019, which the arbitrator comprehensively summarized in his opinion.  (Edelman Op. 4–8.)  After the hearing, the Parties submitted additional briefs.  (*Id*. at 4.)  After reviewing the evidence, Arbitrator Edelman ruled in favor of the City, denied Plaintiff's grievance, and upheld Plaintiff's termination on November 18, 2019. (Defs' 56.1 ¶ 148; Pl's Resp. 56.1 ¶ 148; Edelman Op. 13.)  Given this, the Court finds that Arbitrator Edelman's "findings amount[] to probative evidence in support of summary judgment on discrimination and retaliation claims."  *Miller v. City of Ithaca*, No. 10-CV-597, 2019 WL 5883697, at *6 (N.D.N.Y. Nov. 12, 2019); *see also Russell v. N.Y. Univ.*, No. 15-CV-2185, 2017 WL 3049534, at *33 (S.D.N.Y. July 17, 2017) ("[T]he Court finds the arbitrator's findings to be highly probative of the absence of discriminatory intent in connection with her termination"), *aff'd*, 739 F. App'x 28 (2d Cir. 2018) (summary order); *Tomasino v. Mt. Sinai Med. Ctr. and Hosp.*, No. 97-CV-5252, 2003 WL 1193726, at *12 (S.D.N.Y. Mar. 13, 2003) ("The court concludes that the Arbitrator's decision . . . is entitled to great weight as to his factual findings.").

As such, and as outlined by *Collins*, the burden shifts to Plaintiff to "present strong evidence that the decision was wrong as a matter of fact—e.g. new evidence not before the tribunal—or that the impartiality of the proceeding was somehow compromised." *Collins*, 305

F.3d at 119; *see also Hardy v. Pepsi Bottling Co. of N.Y., Inc.*, No. 14-CV-4007, 2016 WL

1301181, at *7 (S.D.N.Y. Mar. 31, 2016) (stating that, after reviewing the decision of an

independent arbitrator, a plaintiff "faces a higher burden to show that his termination was

motivated by his" protected class).  However, Plaintiff has failed to provide *any* evidence

undermining the impartiality or sufficiency of the arbitrator proceedings, instead relying on a

Supreme Court case from 1974 to assert that "arbitrators should not be allowed to substitute their

judgment (and their outspoken credibility determinations) for that of a federal judge, especially

in regard to a motion for summary judgment under Title VII."  (Pl's Opp. 5 (citing *Alexander v.

Gardner-Denver Co.*, 415 U.S. 36 (1974).)  For numerous reasons, the Court finds Plaintiff's

response lacking and unpersuasive.

        In *Alexander v. Gardner-Denver Co.*, 415 U.S. 36 (1974), the Supreme Court reviewed a

district court decision that "found that [a] claim of racial discrimination had been submitted to

the arbitrator and [was] resolved adversely to the petitioner," and because petitioner "voluntarily

elected to pursue his grievance . . . under the nondiscrimination clause of [a] collective-

bargaining agreement, [petitioner] was bound by the arbitral decision and thereby [was]

precluded from suing his employer under Title VII."  *Id*. at 43.  Plaintiff is correct that, "just like

[Plaintiff] now, the plaintiff in *Alexander* had lost a union grievance on termination and also, like

[Plaintiff] now had received a 'right to sue' from an EEOC that could not find discrimination in

its own investigation."  (Pl's Opp. 5.)  Plaintiff argues that the petitioner in *Alexander* "was still

permitted to proceed to the steps of federal courthouse," insinuating that by following *Collins*,

the Court would be "allow[ing]" arbitrators "to substitute their judgment . . . for that of a federal

judge."  (*Id*.)  However, to the extent Plaintiff appears to be arguing that *Alexander* and *Collins*

conflict, the Court must disagree.

In *Alexander*, the Supreme Court faced holdings from both the district court and the court of appeals that the "petitioner was bound by the prior arbitral decision and *had no right to sue* under Title VII." *Alexander*, 415 U.S. at 45 (emphasis added). The Supreme Court emphatically disagreed, finding that "[t]here is no suggestion in the statutory scheme that a prior arbitral decision either forecloses and individual's right to sue or divests federal courts of jurisdiction." *Id*. at 47. Most importantly, however, the Court did not find that an arbitral decision was improper to use as evidence, or otherwise should not be considered in a Title VII case. In fact, the Court said that "arbitral decision[s] may be admitted as evidence and accorded such weight as the court deems appropriate." *Id*. at 60. This is entirely consistent with the Second Circuit's decision in *Collins*, which, in determining "how much weight to give a particular arbitration decision," cited *Alexander* in noting that the weight is "left to [a] court's discretion and depends on facts and circumstances of each case." *Collins*, 305 F.3d at 119. This Court, in determining that Arbitrator Edelman's findings are probative of the absence of discriminatory intent, is well within the bounds of *Alexander* and *Collins*.[6]

---

[6] The Court notes, however, that Defendants' arguments go too far as to the weight afforded to arbitration decisions. Though Defendants claim that they "are not asserting that the decision of [A]rbitrator Edelman is 'dispositive' of [Plaintiff's] Title VII claims," (*See* Defs' Reply 4.), they also argue that "the Court can give such decision preclusive effect." (Defs' Mem. 10–11 (collecting cases).)

"[A] review of cases in th[e] [Second] Circuit yields almost no support for giving preclusive effect to factual findings from contractual arbitration." *Miller*, 2019 WL 5883697, at *6 (citing *Wilson v. N.Y.*, No. 15-CV-23, 2018 WL 1466770, at *9 (E.D.N.Y. Mar. 6, 2018)); *see also Siddiqua v. N.Y. State Dept. of Health*, 642 Fed. App'x 68, 71 (2d Cir. 2016) (summary order) (finding that *Gardner–Denver* "prohibits a court from dismissing [a plaintiff's discrimination] claims by giving preclusive effect to findings of fact made by the [a]rbitrator in resolving [a plaintiff's] contract claims"). "Most courts have simply followed *Collins* and held that arbitration findings amounted to probative evidence in support of summary judgment on discrimination and retaliation claims." *Miller*, 2019 WL 5883697, at *6. In fact, the court in *Miller* addressed a case cited by Defendants, stating that the district court in *Beaton v. Metro. Transp. Auth. N.Y.C. Transit*, No. 15-CV-8056, 2018 WL 1276863 (S.D.N.Y. Mar. 2, 2018)

Of course, while an arbitrator's decision is highly probative of the absence of discriminatory intent, the Court conducts an independent review of the facts put forth by the Parties. Even reviewing the facts in the light most favorable to the Plaintiff and drawing all reasonable inferences in his favor—as this Court must at summary judgment—the Court agrees with Defendants that they have established legitimate and nondiscriminatory reasons for Plaintiff's termination. (*See* Defs' Mem. 12–14.) The Parties agree on the relevant facts related to Plaintiff's termination: after refusing to conduct the fit test for his new face mask, Plaintiff was advised in writing that he "need[ed] to comply with the requirements to be fit tested, as this [was] required to use the full face mask [Plaintiff's] physician ha[d] prescribed[.]" (Field Decl. Ex. Z at 2; *see also* Defs' 56.1 ¶ 128; Pl's Resp. 56.1 ¶ 128.) Importantly, Plaintiff previously provided the City with a doctor's note that stated that a full face mask was "necessary" for Plaintiff to do "environmental work" assigned by the City. (Field Decl. Ex. Z at 2; *see also* Defs' 56.1 ¶ 121; Pl's Resp. 56.1 ¶ 121.) In an effort to accommodate Plaintiff's allergies, the City advised Plaintiff in writing that if he "wish[ed] to have [his] physician prescribe an alternative full face mask that would be in compliance with OSHA regulations on respiratory protection to address working with severe allergies, [he was to] provide the City with the information no later than June 14, 2019." (Field Decl. Ex. Z at 2; *see also* Defs' 56.1 ¶ 130; Pl's Resp. 56.1 ¶ 130.) Plaintiff simply did not provide a new doctor's note by the deadline, instead offering protestations and excuses in briefing before this Court about his doctor's availability to write a doctor's note. (Defs' 56.1 ¶ 138; Pl's Resp. 56.1 ¶ 138.) As such, and as

---

"went beyond the well-established approach in *Collins*" rather than following clear Second Circuit authority. *Miller*, 2019 WL 5883697, at *6. As such, the Court declines to entertain Defendants' assertion that the arbitrator's decision should be given preclusive effect.

the City is entitled to do, Plaintiff's employment was terminated for insubordination.  (Defs' 56.1 ¶¶ 139, 145; Pl's Resp. 56.1 ¶¶ 139, 145.)

Courts in the Second Circuit are clear that "[e]mployee insubordination and other conduct that is disruptive to the workplace are legitimate, nondiscriminatory reasons for terminating an employee." *Gilani v. Teneo, Inc.*, No. 20-CV-1785, 2021 WL 3501330, at *14 (S.D.N.Y. Aug. 4, 2021) (collecting cases); *see also Matima v. Celli*, 228 F.3d 68, 79 (2d Cir. 2000) ("We have held generally that insubordination and conduct that disrupts the workplace are legitimate reasons for firing an employee." (quotation marks and citations omitted)).  While Plaintiff may object to Arbitrator Edelman's "outspoken credibility determinations," (Pl's Opp. 5; *see also* Edelman Op. 9, 11–12; Defs' 56.1 ¶¶ 149–50; Pl's Resp. 56.1 ¶¶ 149–50), the Court's assessment of the fact of the termination is both agreed upon by both Parties and consistent with Arbitrator Edelman's findings.[7]  Moreover, the Parties agree on *numerous* undisputed facts that create a *substantial* record of Plaintiff's documented behavioral problems, resulting in numerous notices of disciplines and upheld decisions through the union's grievance and arbitration process throughout Plaintiff's short three-year tenure at WSD.  *See* Section I.A.1–2.  As such, due to the

---

[7] The Court also notes that, to the extent Plaintiff wishes to argue that evidence of discrimination was not before Arbitrator Edelman, "[u]nder *Collins* and its progeny, failure to address the discrimination issue in an arbitration does not diminish the impact of that arbitration on a subsequent discrimination action." *Watton v. Cnty. of Rockland*, No. 16-CV-571, 2018 WL 3632523, at *6 (S.D.N.Y. July 27, 2018) (quoting *Simpson v. N.Y.S. Dep't of Civil Serv.*, No. 02-CV-1216, 2005 WL 545349, at *15 (N.D.N.Y. Mar. 1, 2005), *aff'd sub nom. Simpson v. N.Y.S. Dep't of Civil Servs.*, 166 Fed. App'x 499 (2d Cir. 2006) (summary order)); *see also Spell v. United Parcel Servs.*, No. 09-CV-4375, 2012 WL 4447385, at *2 (E.D.N.Y. Sept. 25, 2012) ("[T]he law is clear that [a plaintiff's] failure to raise his discrimination claims before the arbitrator is 'immaterial' to whether the arbitral determination should be given substantial weight." (collecting cases)).  "As long as the arbitrator has properly evaluated the factual, nondiscriminatory reasons for the termination, 'the fact that the arbitration did not adjudicate [the plaintiff's] discrimination claim is irrelevant.'" *Spell*, 2012 WL 4447385, at *2 (quoting *Weeks v. N.Y.S. Div. of Parole*, 78 Fed. App'x 764, 766 (2d Cir. 2003) (summary order)).  As such, the Court is permitted to weigh Arbitrator Edelman's finding in deciding this instant Motion.

highly probative evidence put forth in Arbitrator Edelman's decision as well as this Court's independent review of Plaintiff's termination and employment history, the Court finds that Defendants have met their burden to offer a legitimate, non-discriminatory reason for terminating Plaintiff.

Because Defendants have met their burden, the burden shifts to Plaintiff to produce evidence that Defendants' reason is pretextual. *Farmer*, 473 F. Supp. 3d at 324 (citing *Littlejohn*, 795 F.3d at 307–08); *see also Abrams*, 764 F.3d at 251 ("[T]he final and ultimate burden is on the plaintiff to establish that the defendant's reason is in fact pretext for unlawful discrimination."). Plaintiff appears to argue—albeit solely for his retaliation claim—that Defendants proffered reasons are pretextual because Defendants have presented "shifting" reasons for Plaintiff's termination. (Pl's Opp. 7.) Specifically, Plaintiff identifies the following "shifting reasons" for his termination: (1) a late doctor's note "by a matter of hours"; (2) Plaintiff's facial hair; and (3) insubordination. (*Id.*)

While "inconsistent explanations for a challenged employment action can be evidence of pretext," *Gilani*, 2021 WL 3501330, at *15 (alteration, quotation marks, and citation omitted), Defendants' explanations have not "shifted in a way that would demonstrate pretext," *id.* (quoting *Fahrenkrug v. Verizon Servs. Corp.*, No. 11-CV-1014, 2015 WL 13021890, at *17 (N.D.N.Y. May 14, 2015), *aff'd*, 652 F. App'x 54 (2d Cir. 2016) (summary order)). In fact, it is not clear that Defendants' explanations have shifted at all. Instead, all of the "shifting reasons" provided by Plaintiff are all related to the same incident: Plaintiff needed to get fit-tested for a mask that *his own doctor* indicated was "necessary" to conduct his work for the City, Plaintiff failed to get fit-tested because he refused to comply with facial hair requirements, and Plaintiff failed to provide the City with a doctor's note approving an alternative face mask or otherwise

excusing Plaintiff's refusal to comply with the City's requirements.  *See* Section I.A.3.  These reasons are not "shifting," they "instead are entirely consistent with the view put forth by" the City, namely that Plaintiff's insubordination—specifically his refusal to comply with a requirement necessary to work for the City in his role—led to Plaintiff's termination of employment.  *Ulrich v. Moody's Corp.*, No. 13-CV-8, 2017 WL 1232709, at *16 (S.D.N.Y. Mar. 31, 2017), *aff'd*, 721 Fed. App'x 17 (2d Cir. 2018) (summary order); *see also Timothy v. Our Lady of Mercy Med. Ctr.*, 233 Fed. App'x 17, 20 (2d Cir. 2007) (summary order) (explanations are not materially inconsistent where "they share a consistent theme" that supports a defendant's proffered legitimate, non-discriminatory reason for the action).

Accordingly, the Court grants Defendants' Motion for summary judgment on Plaintiff's discrimination claims.

### 3.  Retaliation Claim

"Title VII forbids an employer from discriminating against an employee because the employee 'has opposed any practice made an unlawful employment practice by this subchapter, or because he has made a charge, testified, assisted, or participating in any manner in any investigation, proceeding, or hearing under this subchapter.'"  *Farmer,* 473 F. Supp. 3d at 330 (quoting 42 U.S.C. § 2000e-3(a)).  "The NYSHRL similarly makes it unlawful for an employer to retaliate or discriminate against an employee because []he 'has opposed any practices forbidden under this article or because . . . []he has filed a complaint, testified[,] or assisted in any proceeding under this article.'"  *Id.* (ellipsis in original) (quoting N.Y. Exec. Law § 296(7)).

"The burden-shifting framework laid out in *McDonnell Douglas* . . . governs retaliation claims under both Title VII and NYSHRL."  *Summa v. Hofstra*, 708 F.3d 115, 125 (2d Cir. 2013) (citing *Schiano v. Quality Payroll Sys., Inc.*, 445 F.3d 597, 609 (2d Cir. 2006)).  "To make out a prima facie case of retaliation, a plaintiff must demonstrate that '(1) []he engaged in a

protected activity; (2) the employer was aware of that activity; (3) the employee suffered a materially adverse action; and (4) there was a causal connection between the protected activity and that adverse action.'" *Kelly v. Howard I. Shapiro & Assocs. Consulting Eng'rs, P.C.*, 716 F.3d 10, 14 (2d Cir. 2013) (per curiam) (italics omitted) (quoting *Lore*, 670 F.3d at 157).  "Once a prima facie case of retaliation is established, the burden of production shifts to the employer to demonstrate that a legitimate, non[-]discriminatory reason existed for its action." *Summa*, 708 F.3d at 125 (quoting *Raniola v. Bratton*, 243 F.3d 610, 625 (2d Cir. 2001)).  "If the employer demonstrates a legitimate, non-discriminatory reason, then 'the burden shifts back to the plaintiff to establish, through either direct or circumstantial evidence, that the employer's action was, in fact, motivated by discriminatory retaliation.'" *Id.* (alterations omitted) (quoting *Raniola*, 243 F.3d at 625).  "Significantly, a plaintiff alleging retaliation in violation of Title VII must show at the final step of the analysis that retaliation was a 'but-for' cause of the adverse action, not simply a 'substantial' or 'motivating' factor in the employer's decision." *Nieblas-Love v. N.Y.C. Hous. Auth.*, 165 F. Supp. 3d 51, 70 (S.D.N.Y. 2016) (quoting *Univ. of Tex. Sw. Med. Ctr. v. Nassar*, 570 U.S. 338, 348–49 (2013)).

Defendants primarily argue that Plaintiff cannot establish a prima facie case of retaliation because Plaintiff's various "job performance issues" preceded Plaintiff's protected activity and, in any event, Defendants had legitimate, non-retaliatory reasons for the actions they took toward Plaintiff.  (*See* Defs' Mem. 22–24.)  The Court agrees that Defendants are entitled to summary judgment on Plaintiff's retaliation claims, for the reasons stated below.

Construing the facts in the light most favorable to Plaintiff, the Court finds that Plaintiff engaged in protected activity, at some point during the relevant time period, of which Defendant was aware by lodging internal complaints with the City and WSD regarding Hammonds' and

other unnamed "superiors" treatment of Plaintiff.  *See supra* I.A.1, I.A.2.  *See also Bowen-Hooks v. City of N.Y.*, 13 F. Supp. 3d 179, 222 (E.D.N.Y. 2014) (explaining that for purposes of demonstrating that a plaintiff engaged in protected activity, "[t]he complaint can be informal— an employee does not need to lodge a formal complaint of discrimination" (citing *Cruz v. Coach Stores, Inc.*, 202 F.3d 560, 566 (2d Cir. 2000))); *but see Rojas v. Roman Cath. Diocese of Rochester*, 660 F.3d 98, 107–08 (2d Cir. 2011) (per curiam) ("[I]mplicit in the requirement that the employer have been aware of the protected activity is the requirement that it understood, or reasonably could have understood, that the plaintiff's complaint was directed at *conduct prohibited by Title VII*." (emphasis in original) (alteration and citation omitted)).  However, the Court is skeptical of Plaintiff's purported timeline raising concerns about allegations of discrimination at WSD.

Defendants argue that "Plaintiff has a history of insubordination that began even while he was on probation[,]" arguing that "[w]here, as here, the job performance issues began before the [P]laintiff engaged in any protected activity, the causation needed to support a retaliation claim is lacking."  (Defs' Mem. 22 (collecting cases).)  However, Plaintiff most charitably asserts in an affidavit—without any supporting evidence—that he first reported to his supervisor, Rambo, that Assistant Water Superintendent Powell was "being verbally abusive and very hostile" toward Plaintiff prior to May 2017.  (*See* Pl's Resp. 56.1 ¶ 50; Pl's Aff. ¶ 10.)[8]  From this, Plaintiff argues that every adverse employment action taken against him, from that moment on,

---

[8] For the purposes of demonstrating that he engaged in protected activity, Plaintiff's complaint "can be informal—an employee does not need to lodge a formal complaint of discrimination."  *See Bowen-Hooks*, 13 F. Supp. 3d at 222.  However, at summary judgment, a plaintiff "cannot create an issue of [material] fact simply by citing [his] own deposition and affidavit testimony, without more."  *Williams v. N.Y.C. Dep't of Educ.*, No. 19-CV-1353, 2021 WL 1178118, at *7 (S.D.N.Y. Mar. 29, 2021) (citing *Kunik v. N.Y.C. Dep't of Educ.*, 436 F. Supp. 3d 684, 695 (S.D.N.Y. 2020) (collecting cases)).

represented the beginning of a campaign by his superiors to "exaggerate[]" Plaintiff's problems

at work.  (*See e.g.* Pl's Aff. ¶ 11 (tying Plaintiff's written reprimand in July 28, 2017 to

discussions between Nardone and Rambo regarding "the issues [Plaintiff] brought up to"

Rambo).)

Construing Plaintiff's allegations in his favor, by first raising these harassment

allegations prior to May 2017, Plaintiff may have made Defendants aware of his protected

activity prior to Plaintiff's first formal conversation with Rambo, which occurred six months into

his probationary period where Rambo raised concerns about Plaintiff's job performance.  (Defs'

56.1 ¶¶ 50–51; Pl's Resp. 56.1 ¶¶ 50–51.)  This would firmly predate the memo Rambo received

from Powell "recounting various issues with [Plaintiff], including a lack of respect for his

supervisors, difficulty in getting along with his co-workers, questioning his work assignments,

and problems with arriving to work on time."  (Defs' 56.1 ¶¶ 50–51; Pl's Resp. 56.1 ¶¶ 50–51.)

However, Plaintiff's affidavit provides *no indication whatsoever* that Plaintiff raised these

concerns to Rambo indicating that the alleged harassment was *because of* Plaintiff's membership

in a protected class.  (*See* Pl's Aff. ¶¶ 6–15.)  An employer's awareness of Plaintiff's protected

activity is relevant where it is evidence "that it understood, or reasonably could have understood,

that the plaintiff's complaint was directed at *conduct prohibited by Title VII*."  *Rojas*, 660 F.3d at

107–08 (emphasis in original) (alteration and citation omitted)).

Without Plaintiff's affidavit, Plaintiff's first documented allegations of harassment and

discrimination are found in his letter requesting a transfer to another Laborer position on May 14,

2018.  (Defs' 56.1 ¶ 64; Pl's Resp. 56.1 ¶ 64; *see also* 2018 Compl. Ltrs. at 2.)  However, the

Parties are unclear about the exact timeline of Plaintiff's discrimination-based complaints.  (*See*

Defs' Mem. 22 (asserting without citation that Plaintiff's "job performance issues began before

the [P]laintiff engaged in any protected activity," without defining when the protected activity

began).  And as Defendants aptly point out, the Second Circuit has been clear that "[w]here

timing is the only basis for a claim of retaliation, and gradual adverse job actions began well

before the plaintiff had ever engaged in any protected activity, an inference of retaliation does

not arise."  *Slattery v. Swiss Reins. Am. Corp.*, 248 F.3d 87, 95 (2d Cir. 2001); *see also Heiden v.*

*N.Y.C. Health and Hosps. Corp.*, No. 20-CV-10288, 2023 WL 171888, at *24 (S.D.N.Y. Jan. 11,

2023) ("Were it otherwise, an employee concerned about the risk of an adverse action could

forestall the action—and effectively hamstring his employer—with an artfully timed request for

accommodation or complaint about discrimination."); *Gonzalez v. NYU Langone Hosps.*, 2022

WL 4372199, at *2 (2d Cir. Sept. 22, 2022) (summary order) (finding that a plaintiff's

"extensive history of performance issues and ongoing discipline . . . prevent[s] her from

establishing an indirect causal connection" for retaliation); *Dixon v. Int'l Fed'n Of Accts.*, No.

09-CV-2839, 2010 WL 1424007, at *6 (S.D.N.Y. Apr. 9, 2010) (finding that a plaintiff could not

sustain a retaliation claim when she "was subjected to repeated critiques and complaints about

her management and performance skills before she ever lodged any complaints about

discrimination"), *aff'd*, 416 F. App'x 107 (2d Cir. 2011) (summary order).  However, because

Defendant did not respond to Plaintiff's assertions, (*see generally* Defs' Reply), the Court

declines to base its ruling upon the confusing timeline established by both Parties in briefing.

Even if Plaintiff were able to establish a prima facie case of discrimination, Defendants

have provided several legitimate, non-discriminatory reasons for actions taken against Plaintiff,

and Plaintiff has not offered any credible evidence of pretext.  Indeed, Plaintiff has a lengthy

history of disciplinary action throughout his tenure at WSD.  *See supra* Section I.A.2.  The

Parties have outlined several incidents of insubordination, critiques, and complaints about

Plaintiff's job performance, which together resulted in—at a minimum—one counseling memo,[9] one written reprimand, seven notices of discipline, two suspensions of varying lengths, and the loss of vacation days. *See id*. These alone can be seen as legitimate reasons for the various adverse actions. *See Kamrowski v. Morrison Mgmt. Specialist*, No. 05-CV-9234, 2010 WL 3932354, at *19 (S.D.N.Y. Sept. 29, 2010) (establishing legitimate non-discriminatory reasons "by providing evidence that [the plaintiff] was challenging the decisions of her supervisor, not completing her work assignments, and having difficulties communicating and working with co-workers and other supervisors" (collecting cases)). In addition, Plaintiff filed grievances and went before several neutral arbitrators for the more severe adverse employment actions, where the arbitrators substantively ruled for the City each time. *See supra* Section I.A.2. As such, Defendants have rebutted Plaintiff's prima facie case. *See Russell*, 2017 WL 3049534, at *33 ("[T]he Court finds the arbitrator's findings to be highly probative of the absence of discriminatory intent in connection with her termination"); *Collins*, 305 F.3d at 118–119 ("Here . . . the tribunal received all the available evidence in an evenhanded proceeding and rendered a decision consistent with the almost overwhelming evidence of [a legitimate, nondiscriminatory reason for termination].") *Tomasino*, 2003 WL 1193726, at *12 ("The court concludes that the Arbitrator's decision . . . is entitled to great weight as to his factual findings.").

---

[9] A formal counseling memo, without a tangible negative consequence does not constitute an adverse employment action. *See, e.g.*, *Weeks v. N.Y. State (Div. of Parole)*, 273 F.3d 76, 86 (2d Cir. 2001) (describing similar "notices of discipline" and "counseling memos" as "insufficient" because the plaintiff alleged no facts to infer a materially adverse change in working conditions), *abrogated on other grounds by Nat'l R.R. Passenger Corp.*, 536 U.S. 101; *Maragh v. Roosevelt Island Operating Corp.*, No. 16-CV-7530, 2018 WL 6573452, at *3 (S.D.N.Y. Dec. 13, 2018) (holding that counseling memo is not adverse action unless it "lead[s] to more substantial employment actions that are adverse") (quoting *Bader v. Special Metals Corp.*, 985 F. Supp. 2d 291, 306 (N.D.N.Y. 2013)).

Finally, Plaintiff has not shown that the City's legitimate, non-discriminatory reasons for disciplining him or terminating him was pretext for retaliation.  Plaintiff's only argument related to pretext is that the City's "shifting reasons" for termination are sufficient to overcome summary judgment.  (*See* Pl's Opp. 7.)  However, "[f]or the same reasons [P]laintiff cannot establish an inference of discrimination on [his discrimination claim], [P]laintiff fails as a matter of law to establish a causal connection on [his] retaliation claim."  *Watton*, 2018 WL 3632523, at *7 (citing *Hedlund v. N.Y.C. Transit Auth.*, 507 Fed. App'x 35, 37 (2d Cir. 2013) (summary order)).  Therefore, Defendants' Motion for summary judgment on Plaintiff's retaliation claim is granted.

### 4.  Hostile Work Environment Claim

Finally, Title VII and the NYSHRL prohibit employers from subjecting employees to a hostile work environment.  *See Littlejohn*, 795 F.3d at 320 (explaining that "[t]he phrase terms, conditions, or privileges of employment [in Title VII] evinces a congressional intent to strike at the entire spectrum of disparate treatment, which includes requiring people to work in a discriminatorily hostile or abusive environment" (alteration omitted) (quoting *Redd v. N.Y. Div. of Parole*, 678 F.3d 166, 175 (2d Cir. 2012))); *see also* N.Y. Exec. Law § 296(1)(a).  Here, again, claims under both statutes are judged under broadly the same standard.  *See Zheng-Smith*, 486 F. Supp. 3d at 623 ("As with discrimination, analyses of hostile work environment claims under federal and New York law are coextensive."); *Farmer*, 473 F. Supp. 3d at 334 ("Hostile work environment claims under Title VII and the NYSHRL are judged by the same standard." (citing *Summa*, 708 F.3d at 123–24)).[10]

─────────────────────

[10] The only difference amongst the various standards is that "[o]n October 11, 2019, amendments to the NYSHRL came into effect that eliminated the 'severe and pervasive standard,'" such that plaintiffs now need to show only that they were "subjected to inferior

"A hostile work environment claim requires a showing [1] that the harassment was 'sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment,' and [2] that a specific basis exists for imputing the objectionable conduct to the employer." *Alfano v. Costello*, 294 F.3d 365, 374 (2d Cir. 2002) (quoting *Perry v. Ethan Allen, Inc.*, 115 F.3d 143, 149 (2d Cir. 1997)). "The plaintiff must show that the workplace was so severely permeated with discriminatory intimidation, ridicule, and insult that the terms and conditions of her employment were thereby altered." *Id.* (citing *Leibovitz v. N.Y.C. Transit Auth.*, 252 F.3d 179, 188 (2d Cir. 2001)). "This test has objective and subjective elements: the misconduct shown must be 'severe or pervasive enough to create an objectively hostile or abusive work environment,' and the victim must also subjectively perceive that environment to be abusive." *Id.* (quoting *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 21 (1993)). "As a general rule, incidents must be more than 'episodic; they must be sufficiently continuous and concerted in order to be deemed pervasive.'" *Id.* (quoting *Perry*, 115 F.3d at 149).

Moreover, "[i]t is axiomatic that mistreatment at work, whether through subjection to a hostile environment or through such concrete deprivations as being fired or being denied a promotion, is actionable under Title VII only when it occurs because of an employee's sex, or other protected characteristic." *Brown v. Henderson*, 257 F.3d 246, 252 (2d Cir. 2001) (citing *Oncale*, 523 U.S. at 79–80); *see also Brennan v. Metro. Opera Ass'n, Inc.*, 192 F.3d 310, 318 (2d Cir. 1999) ("[A]n environment which is equally harsh for both men and women or for both young and old does not constitute a hostile working environment under the civil rights statutes."). And in making this determination, "the courts have consistently emphasized that the

---

terms, conditions, or privileges of employment because of the individual's membership in one or more protected categories." *Tortorici v. Bus-Tev, LLC*, No. 17-CV-7507, 2021 WL 4177209, at *13 (S.D.N.Y. Sept. 14, 2021).

ultimate issue is the reasons for *the individual plaintiff's* treatment, not the relative treatment of different *groups* within the workplace." *Brown*, 257 F.3d at 252 (citing *Connecticut v. Teal*, 457 U.S. 440, 453–54 (1982)).

Defendants argue that they are entitled to summary judgment on Plaintiff's hostile work environment claims because "even assuming that Plaintiff's allegations were true . . ., the comments do not rise to the level of a viable claim." (Defs.' Mem. 18.)  The Court agrees.

Plaintiff argues that there are several material disputed facts sufficient to withstand summary judgement.  Specifically, Plaintiff cites the following: (1) alleged comments made by Hammonds; (2) "the isolation of Plaintiff"; (3) "the mask games Peekskill played"; (4) Plaintiff's disparate treatment; and (5) retaliation.  (Pl's Opp. 5–6.)  As discussed, the Court deems Plaintiff's arguments regarding disparate treatment and the denial of PPE as abandoned at summary judgment.  *See supra* Section II.B.1.  In addition, the Court has found that Plaintiff failed to establish a prima facie case of retaliation.  *See supra* Section II.B.3.

With respect to the comments allegedly made by Hammonds, Plaintiff has not established a prima facie claim for a hostile work environment.  Plaintiff at most establishes that Hammonds made inappropriate comments a handful of times throughout Plaintiff's three-year tenure, falling far short of the severe or pervasive behavior required for a hostile work environment claim.  (*See* Defs' 56.1 ¶¶ 153–55; Pl's Resp. 56.1 ¶¶ 153–55.)  "Measured against reported cases, this [alleged] pattern of behavior is insufficiently frequent to support a claim for hostile work environment."  *Daniel v. T&M Prot. Res. LLC*, No. 13-CV-4384, 2018 WL 3621810, at *20 (S.D.N.Y. July 19, 2018) (collecting cases); *see also Petrosino v. Bell Atlantic*, 385 F.3d 210, 223 (2d Cir. 2004) ("[I]solated incidents of offensive conduct (unless extremely serious) will not support a claim of discriminatory harassment."); *Augustin v. Yale Club of N.Y.C.*, No. 03-CV-

1924, 2006 WL 2690289, at *22 (S.D.N.Y. Sept. 15, 2006) (holding "infrequent and sporadic" remarks "over the course of five years, insufficient, as a matter of law, for [p]laintiff to maintain a hostile work environment claim"), *aff'd*, 274 F. App'x 76 (2d Cir. 2008) (summary order). With respect to the isolation claim, the Court must first note that Plaintiff argues for the first and only time in his Opposition—without any supporting evidence—that he felt "isolated" in the workplace.  (*See* Pl's Opp. 3, 6.)  Moreover, Plaintiff makes no showing that this "isolation" was at all connected to his national origin, and even if he did, the mere fact that of "isolation" is "insufficient to create a hostile environment, particularly given that Plaintiff gives no specific examples of this behavior beyond this general assertion."  *Kassel v. City of Middletown*, 272 F. Supp. 3d 516, 543 (S.D.N.Y. 2017).

Accordingly, the Court grants Defendants' motion for summary judgment on Plaintiff's hostile work environment claim.

### III.  Conclusion

For the foregoing reasons, Defendant's Motion for Summary Judgment is granted.  The Clerk of Court is directed to terminate the pending motion at Dkt. No. 40; enter judgment for the Defendants; and close this case.

SO ORDERED.

Dated:    March 27, 2023
           White Plains, New York

_____
            KENNETH M. KARAS
            United States District Judge

40